IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 17, 2013 Session

## STATE OF TENNESSEE v. TRAVIS WILSON

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S61256    Robert H. Montgomery, Judge**

———————————

**No. E2013-00371-CCA-R3-CD - Filed August 4, 2014**

———————————

A Sullivan County Criminal Court Jury convicted the appellant, Travis Wilson, of driving under the influence (DUI), second offense; unlawful carrying or possession of a weapon; possession of drug paraphernalia; and possession of a handgun while under the influence. After a sentencing hearing, the trial court sentenced the appellant to eleven months and twenty-nine days for each conviction, with release eligibility after service of seventy-five percent of the sentences. The trial court ordered that the appellant serve the DUI sentence in confinement and the remaining sentences on probation. The court further ordered that the sentences for possession of drug paraphernalia and DUI, second offense, be served concurrently with each other but consecutively to the remainder of the sentences. On appeal, the appellant contends that the trial court erred by allowing two Tennessee Bureau of Investigation (TBI) agents to testify as experts about the effects of drugs on human performance; that the trial court erred by failing to exclude his blood test results; that the trial court erred by failing to require the State to refer to "bath salts" by their chemical name; that the evidence is insufficient to support the convictions; and that the trial court erred in sentencing. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Ashley Boyer, Jonesborough, Tennessee, for the appellant, Travis Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Barry P. Staubus, District Attorney General; and Benjamin Rowe and Emily Smith, Assistant District Attorneys General, for the appellee, the State of Tennessee.

**OPINION**

**I. Factual Background**

At trial, Herman Franklin Biggs testified that he lived on Cross Community Road in Blountville, Tennessee. Biggs said the paved asphalt driveway to his house was approximately 300 feet long, began at a fairly slight incline, and rose to a twenty-percent grade after the first 200 feet. The driveway was connected to Cross Community Road, a public roadway. Biggs said it was impossible for someone to drive into his driveway without first driving on Cross Community Road.

Biggs testified that late one evening in early 2012, the appellant came to his door carrying a small air compressor. The appellant told Biggs that one of his car tires was flat and asked for permission to plug up his compressor to reinflate the tire. Biggs allowed the appellant to use an exterior outlet on the side of his house. About five minutes later, the compressor was charged, and the appellant left. Biggs did not see the appellant's car that night.

Biggs testified that two to four weeks later, he looked out his kitchen window and saw the appellant drive into his driveway. The appellant drove behind the house, and his car "bump[ed]" Biggs's car. The appellant backed up and got out of the car. He appeared to be disoriented and confused, had difficulty walking, and repeatedly touched the car to steady himself. Biggs went outside, and the appellant apologized for hitting the car and explained that he needed help because his car's engine was "misfiring." The appellant did not mention having a flat tire, and Biggs did not notice anything wrong with the car. Biggs said his driveway was steep and opined that a car having engine problems would have been unable to get to his house.

Biggs testified that he thought the appellant was intoxicated or on drugs because the appellant was "confused, disoriented, [and] dare I say delusional. He was just out of it." Biggs felt threatened and told the appellant to leave, but the appellant did not seem to comprehend the instruction. Biggs's wife, who was in the nearby sunroom, called 911 when the appellant refused to leave. A couple of minutes later, the appellant got into his car, backed up the vehicle, and drove down the driveway. Shortly thereafter, Biggs's daughter arrived and informed Biggs that the appellant had stopped the car on the grass at the end of

-2-

the driveway and that police officers were speaking with him. Biggs drove down the driveway and saw officers administering field sobriety tests to the appellant.

On cross-examination, Biggs testified that the appellant was driving the car that struck Biggs' car, that Appellant was driving only two or three miles per hour, and that Biggs' vehicle was not damaged. He said the appellant "was acting belligerently for some reason or he had serious coordination problems, either depth perception, muscle control, what have you." Biggs acknowledged that he never saw the appellant drive on a public roadway.

Sullivan County Sheriff's Detective Matthew Price testified that on February 28, 2012, he was driving home after work and heard a report over his police radio about a suspicious vehicle on Cross Community Road. Detective Price lived nearby and went to the address. As he turned onto Cross Community Road, he saw a four-door car stopped at the edge of a driveway. The front of the car was pointed towards the road, but Detective Price could not recall if the car's engine was running. He said the appellant was sitting in the driver's seat with his hands on the steering wheel. Detective Price turned into the driveway so that his unmarked Chevrolet Impala was "nose to nose" with the appellant's car and activated his Impala's blue lights. The appellant jumped out of his car, ran to the open trunk, and began rummaging inside. Detective Price stepped out of his vehicle, identified himself as a law enforcement officer, and instructed the appellant to walk toward him. However, the appellant did not acknowledge Detective Price and acted "wild, bouncing off the walls . . . [and] just not compliant." When Detective Price approached, the appellant ran to the passenger side of the vehicle and began digging underneath the passenger seat, "actively looking for something." Detective Price grabbed the appellant and pulled him out of the car.

Detective Price testified that by that time, "Officer Campbell" had arrived at the scene. Officer Campbell helped Detective Price handcuff the appellant. While Officer Campbell restrained the appellant, Detective Price looked inside the car. He found a loaded revolver in a holster under the front passenger seat. Officer Eric Davis arrived, and he and Officer Campbell administered field sobriety tests to the appellant. Detective Price thought the appellant was "under the influence of something, some type of drug or something."

On cross-examination, Detective Price testified that he was unable to provide a video of the incident because his car was not equipped with a video recorder. He said the appellant did not speak to him when the appellant got out of the vehicle and ran to the trunk. After the officers handcuffed the appellant, the appellant said "something to the effect of the car being broke down."

Sullivan County Officer Eric Davis testified that on February 28, 2012, he responded to a call on Cross Community Road and saw Officer Campbell leading the handcuffed

appellant to Officer Campbell's car. The appellant was "walking somewhat all right," was "talking a lot" about wanting a blood test, and had slurred speech. The appellant did not mention that his car had a flat tire. Officer Davis thought the appellant might be impaired, and Officer Campbell asked the appellant to perform field sobriety tests. Officer Davis moved his police cruiser in order for its dash camera to record the field sobriety tests.

Officer Davis testified that the first test was the "stop and turn," during which the appellant was to hold his hands at his sides and walk an imaginary line, heel to toe, for seven steps before pivoting on one foot and returning, heel to toe, for seven steps. Officer Campbell demonstrated the test to ensure the appellant understood the directions. During the test, the appellant "started to take the test and then he stop[ped] and started over again basically, went down his pivot, wasn't correct on the back." He also stepped off the imaginary line at least once.

Officer Davis testified that before the second test, the "one leg stand," the appellant was instructed to put his feet together, keep his hands at his side, lift one leg six inches off the ground, point the toes of the foot of the lifted leg, and count silently to thirty. While performing the test, the appellant did not point his toes and lifted his leg too far off the ground. Officer Campbell also had the appellant perform a "finger dexterity test." Officer Davis recalled that the appellant did not pass the test but could not specifically recall what the appellant did incorrectly.

Officer Davis testified that he and Officer Campbell discussed the appellant's performance on the tests, determined that he was too impaired to drive safely, and arrested him for DUI. During a search of the appellant, the officers found two pipes and liquid "in a bottle with a rubber top for putting a syringe through." Officer Davis described one of the pipes as "more of a thing to snort things with." The pipe was made from part of a pen, had tape around it, and had white powder residue on the tip. Officer Davis said the pen pipe could be "used to snort crushed pills, cocaine, something, maybe bath salts." He said the other pipe was typically used for smoking "[m]arijuana, something you can inhale burning smoke with."

Officer Davis testified that during a search of the appellant's vehicle, police found a handgun, a pipe, and a syringe with a melted plunger. Officer Davis said that the pipe could be used for "[a]nything you want to smoke. I've never seen . . . them used for anything legal, let's put it that way; marijuana, bath salts, that kind of thing." A records check revealed that the appellant did not have a permit for the gun. Officer Davis said that Officer Campbell asked the appellant to consent to a blood test and read an implied consent form to him. The appellant repeatedly gave his consent and signed the form.

-4-

On cross-examination, Officer Davis testified that the officers initially thought the appellant was "on something" and that the field sobriety tests confirmed he was too impaired to drive. He said that before each test, the officers reviewed the directions with the appellant several times and that the appellant was given the opportunity to ask questions, which he did. The appellant was cooperative during the tests, and he requested that a blood or breath sample be taken. Officer Davis said the appellant indicated that the vehicle belonged to his grandmother.

On redirect examination, Officer Davis testified that "[j]ust off the field sobriety test[s, he] was kind of iffy on" whether the appellant was under the influence. However, the appellant acted "very animated and hyper," kept getting close to the officers, and "jump[ed] in [their] conversations." Moreover, his speech was slurred, he stumbled, he did not make sense, and he acted "overly" nervous. Considering the appellant's behavior in conjunction with his performance on the tests, Officer Davis determined that the appellant was under the influence of an intoxicant. On recross-examination, Officer Davis acknowledged that the appellant was not stumbling and that his speech was not slurred on the video of the field sobriety tests.

Adam Gray, a special agent forensic scientist supervisor with the TBI Crime Laboratory, testified as an expert in blood analysis and toxicology that he tested a sample of the appellant's blood. The sample contained ".1198 ug/ml" of alprazolam, a benzodiazepine also known as Xanax. The amount in the appellant's blood was slightly higher than the therapeutic level. Agent Gray explained that benzodiazepines were a class of central nervous system depressant drugs and that alprazolam was generally prescribed to treat depression and anxiety disorders. Alprazolam could cause confusion, hyperactivity, hallucinations, drowsiness, dizziness, blurred vision, or increased sweating. Agent Gray stated that alprazolam also could impair a person's ability to drive.

Margaret Massengill, a special agent forensic scientist with the TBI Crime Laboratory, testified as an expert in blood analysis and toxicology that she tested the appellant's blood and found alprazolam. She explained that her testing method did not quantify the amount of alprazolam; therefore, she gave the sample to her colleague for further testing. Agent Massengill also found alpha-pyrrolidinopentiophenone, also known as alpha-PVP, in the appellant's blood. Agent Massengill said that the TBI began reporting on alpha-PVP, a synthetic cathinone, "a couple of years ago." She explained that cathinone was one of the psychoactive ingredients of Khat, a plant, and that Khat was illegal in the United States and several other countries. Alpha-PVP was typically marketed as "bath salts" with a label warning that the substance was not for human consumption.

Agent Massengill testified that she had been "inundated with information about these bath salts." The information indicated that the effects of bath salts were similar to the effects of the other stimulant drugs such as cocaine and amphetamine. The effects included increased appetite, increased blood pressure, a sense of euphoria, dilated pupils, confusion, delusions, extreme paranoia, and extreme agitation. Additionally, "[e]verything would be sped up, reaction to time would be sped up." She said that most of the information about the effects of alpha-PVP came from users who "self-report[ed]" and that the substance was too unsafe to perform a controlled dosing on humans.

On cross-examination, Agent Massengill testified that although the appellant's blood tested positive for alpha-PVP, she was unable to determine the amount. She explained that "[w]ith bath salts the Tennessee Bureau of Investigation as well as most of the laboratories that I am familiar with are not [quantifying] the Alpha-PVP or any of the other bath salts." Additionally, she did not know when the appellant had ingested bath salts. She said, "There is not a lot of significant data on how quickly it metabolizes, how long it stays in someone's blood stream, that sort of thing."

The appellant testified that on February 28, 2012, he was at his father's house and "[t]rying to stay away from bath salts," which he had last taken three or four days earlier. He also had taken Xanax, which he had been prescribed, twenty-four to thirty-six hours earlier. The appellant telephoned his grandmother and asked her to pick him up. Thereafter, his mother arrived, driving his grandmother's car. He put a handgun, an air compressor, and a box containing other things into the trunk of the car. His mother began driving erratically and "cut[] the curve" near Biggs's house. The appellant thought the tire was damaged and told her to stop so he could fix the tire with the air compressor and "'plug kit'" in the trunk. After they parked, his mother grabbed her purse and cellular telephone, said she was going to get help from a friend who lived nearby, and walked away. The appellant looked at the tire and saw that it had been punctured by a roofing tack or a roofing nail. He removed the nail, plugged the hole, and put air into the tire. He returned the air compressor to the trunk and walked toward the front of the car to check the engine, which had been "missing." At that time, approximately eight police cars arrived. The appellant said that it was not completely dark when the incident occurred.

The appellant testified that the car's tire had been almost completely flat and that he could not have made it to the top of the driveway. He acknowledged, however, that he had been to Biggs's house previously and had "aired my compressor up at his house." He stated that "it was a big coincidence that it was the same place that it happened."

The appellant testified that when the officers arrived, he complied with their instructions and performed the field sobriety tests. The officers searched him, and the only

-6-

items he had on his person were his keys and wallet. The appellant informed the officers that he had a gun in the car. While the officers were speaking with the appellant, Biggs walked down the driveway but was stopped half-way by the officers. The appellant denied owning the pipes found in the car. He said that the officers showed him the syringe and bottle of liquid but that they did not show him the pipes. The appellant said that he thought the gun was unloaded but acknowledged that he might have left it loaded. He said he had bought the gun two weeks earlier and had planned to register it. The appellant denied reaching for the gun, asserting that it was in plain view and that he told the officers the gun was in the car.

Regarding the field sobriety tests, the appellant testified that during the one leg stand, he intentionally held his foot higher than six inches because he was mad and "being smart." He acknowledged that he performed the finger dexterity test four times instead of three. He said that he paused during the finger dexterity test after he counted for the third time because he was looking for some indication of approval from the officers. The officers did not stop him, so he continued counting.

On cross-examination, the appellant conceded that he had taken bath salts previously to give him "extra energy" when he worked long hours at a golf course. He testified that bath salts were very addictive, easy to obtain, and legal to purchase. He said the bath salts kept him awake but did not "energize" him. The appellant maintained that Xanax helped to curb his cravings for the bath salts. He said that on the day in question, he had not taken bath salts for approximately four days and was craving them. The appellant said that when he first started taking bath salts, he dissolved the substance in water and drank it. Later, he progressed to snorting it with a straw. He also sometimes snorted Xanax because it made him feel the effects more quickly. He denied being addicted to Xanax. He said that he had a prescription for Xanax and was supposed to take it three times a day; however, he was unable to bring a copy of his prescription to trial because the doctor who had prescribed the medication had since lost his medical license.

The appellant testified that his mother was driving him to his trailer on his grandmother's property in Bristol, Virginia. On the way, his mother said that she wanted to stop and see a friend. He was uncomfortable with the way his mother was driving and called his girlfriend to see if she or her mother could give him a ride. The appellant did not offer to drive his grandmother's car because she preferred that his mother drive it. The appellant said he never mentioned the tire to the officers. He said he had grown up less than a quarter of a mile from Biggs and had seen Biggs in the neighborhood.

The appellant testified that six to eight police cars "in a train form" pulled over to investigate. He asserted that the police did not begin recording the incident until about half of the officers had left the scene. Approximately ten minutes had elapsed between the time

his mother left and the police arrived.  He said he did not tell the officers that his mother had been driving because she was a convicted felon, and he did not want to get her in trouble. He surmised that his mother had wanted the police to arrest him and that she had "set him up," explaining that she was a convicted felon and a "pathological liar."

Paul Ardis Wilson, the appellant's father, testified that on February 28, the appellant was living with him.  When the appellant left the house, Mr. Wilson looked out the door and saw that the appellant's mother was driving.  The appellant took his pistol, air compressor, tools, and clothes with him.  Mr. Wilson denied that the appellant was impaired when he left the house.

On cross-examination, Mr. Wilson testified that the appellant left the house sometime between 2:00 and 5:00 p.m.  The appellant had stayed with him for three or four days.  Mr. Wilson was trying to convince the appellant to attend night school and get a day job.  He said he was assisting the appellant with transportation.

The State recalled Officer Davis.  He denied that eight police officers responded to the scene and said that he and two other officers responded to the call about six or seven minutes after the complaint was made.  They were in two patrol cars and one unmarked car. Officer Davis said that when he first arrived, the appellant's car was in the grass beside the driveway and that the front end of the car was facing the road.  The appellant did not mention his mother or a flat tire.  Officer Davis said that all four tires on the appellant's car were inflated and that it was driven onto a tow truck.

The jury convicted the appellant of DUI, unlawful carrying or possession of a weapon, possession of drug paraphernalia, and possession of a handgun while under the influence. The State introduced a certified copy of a judgment of the appellant's previous DUI conviction, and the jury convicted him of DUI, second offense.

After a sentencing hearing, the trial court sentenced the appellant to eleven months and twenty-nine days for each conviction, with release eligibility after service of seventy-five percent of the sentences.  The trial court ordered that the appellant serve the DUI sentence in confinement and the remaining sentences on probation.  The court further ordered that the sentences for possession of drug paraphernalia and DUI, second offense, be served concurrently with each other but consecutively to the remainder of the sentences.  On appeal, the appellant contends that the trial court erred by allowing two TBI agents to testify as experts about the effects of drugs on human performance; that the trial court erred by failing to exclude the appellant's blood test results; that the trial court erred by failing to require the State to refer to bath salts by the chemical name "alpha-Pyrrolidinopentiopeptiophenone";

that the evidence is insufficient to sustain his convictions; and that the trial court erred in sentencing the appellant.

## II. Analysis

### A. Expert Witnesses

The appellant contends that the trial court erred by allowing Agents Massengill and Gray to testify as experts about the effects of specific drugs on human performance. Although he acknowledges that the agents were qualified to identify drugs in the blood, he claims that "their qualifications did not authorize them to give an informed opinion as to the effects of the drugs." The State argues that the trial court properly ruled that the agents could testify. We agree with the State.

### 1. Agent Massengill

Immediately before trial, the trial court held a hearing on the appellant's motion to suppress the results of his blood test. Defense counsel argued that the test did not "quantify the bath salts. It just states that they were there which I think would be prejudicial to the [appellant] because we don't have the effects of it or any measure of the bath salts." The State responded that Tennessee Code Annotated section 55-10-407 required that an offender be under the influence of an intoxicant but that "there's nothing that says it has to be quantified." The State acknowledged that it had a witness who would testify as to "what she found in the blood" and to "any effect it might have."

During the hearing, Agent Massengill testified that she graduated from Lincoln Memorial University with a Bachelor's Degree in Medical Technology, which she described as "essentially a Laboratory Science degree with a minor in Chemistry." After graduation, she worked at Baptist Hospital and Medic Regional. She said that she had been employed by the TBI for about nine years and that her duties included testing blood and urine for the presence of drugs or other substances and testifying regarding her findings. She had testified previously in Tennessee courts as an expert in toxicology. However, she had never testified about bath salts.

Agent Massengill testified that as part of their job, agents received "regular training" and kept current "on all the current literature from the Journal of Analytical Toxicology and the Journal of Mass Spectrometry." Agent Massengill was trained by the Federal Bureau of Investigation (FBI) in chromatography. Three months before trial, she completed courses from Indiana University, one dealing with alcohol and one dealing with drugs and their effects on humans. Approximately every other year, she attended conference training from

the Society of Forensic Toxicology, which provided "in-depth training about current issues and recent case studies that are particular to driving under the influence and drugs in general."

On cross-examination, Agent Massengill testified that the second course at Indiana University lasted about forty-hours and was titled "Studies on Drugs and Human Performance." She also attended "an AROD course with the Governor's Highway Safety Office," which discussed "the actual effects of drugs and alcohol on the roadside essentially."

Agent Massengill acknowledged that the "primary purpose" of her job at the TBI was laboratory analysis. Defense counsel asked her about her training in bath salts, and she stated, "Let's talk about the analysis side of it." She said that about November 2011, the TBI Crime Laboratory began trying to find and identify bath salts. She and other agents "quickly found out that we were in fact able to see them in the routine extraction that we were already [performing] so analytically speaking nothing changed for us." At the same time, the Drug Enforcement Agency (DEA) began providing information about identifying bath salts, and the Crime Laboratory's Knoxville Office identified fifteen to twenty variations. Agent Massengill stated that she had never testified about the effects of bath salts and that no dosing studies had been conducted because bath salts were too dangerous. Nevertheless, data was available in journals and publications based on the effects emergency room (ER) doctors were seeing. Also, the DEA and National Institute of Justice had published some reports. However, most of the data was coming from users who were self-reporting the effects and how long the effects lasted.

On redirect examination, Agent Massengill testified that she had read a "case review" by the Nebraska State Patrol, documenting "their findings . . . in which bath salts was not just indicated but confirmed actually in both the male and female subject." In addition, the New England Journal of Medicine had published one or two reports in which ER doctors had reported side effects of bath salts and "general information." She stated that she was also familiar with articles in the New England Journal of Medicine and the Journal of Emergency Medicine in which ER doctors had reported "what the findings were, what the presentment looked like and then also self-reporting."

Agent Massengill testified that bath salts, also known as "alpha-PVP," were synthetic cathinones created as a substitute for natural cathinone, which was illegal. Natural cathinone was one of the psychoactive components in Khat, a plant used for its "stimulant properties." Khat had been found to be psychologically addictive, and its "side effects mimicked other stimulants in that it caused increased heart rate, increased heart palpitations, increased blood pressure and in some cases agitation and delusional thinking; although sometimes just some

sense of euphoria." Agent Massengill said that synthetic cathinone was a "close cousin" to natural cathinone; therefore, their side effects would be similar.

On recross-examination, Agent Massengill testified that, regarding quantifying the amount of cathinone in a person's blood,

> [it is] very difficult because what they're doing is they're chewing on leaves [of the Khat plant] and so we don't know, a: how many leaves they chewed on and we don't know, b: the potency of the caffeine or the cathinone which is contained within the plant. So we don't have a real [toxicological] measure of what someone would look like on any certain level of cathinone either that I am aware of.

However, it had been determined that bath salts "were affecting the brain in the same fashion with the same chemical response in the brain as the cathinone or the stimulant which would be very amphetamine like."

Upon questioning by the trial court, Agent Massengill acknowledged that the literature about which she had testified was the type of material relied upon by experts in this field. At the conclusion of her testimony, defense counsel argued that she was "an expert as to some matters but not bath salts." The trial court ruled that based upon Agent Massengill's "training, experience, knowledge and education," she was qualified to testify as an expert in blood analysis and toxicology and could testify about bath salts and their effects on an individual. The court noted that defense counsel could cross-examine Agent Massengill about her analysis and qualifications.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course." State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987); see Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005). This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

We conclude that the appellant is not entitled to relief. Agent Massengill testified that alpha-PVP, marketed as "bath salts," was a relatively new substance but that information about the effects was available in numerous publications and that she was familiar with the effects reported by ER doctors in the New England Journal of Medicine and the Journal of Emergency Medicine. The trial court concluded that Agent Massengill had demonstrated knowledge about the effects of bath salts that the average juror would not know, and nothing indicated at trial or indicates on appeal that her information lacked trustworthiness. We note that Agent Massengill only listed the side effects of bath salts for the jury; she was not asked for, nor did she offer, an opinion as to whether bath salts were responsible for the appellant's behavior on February 28. Therefore, we cannot say that the trial court abused its discretion by ruling that she could testify about the effects of bath salts.

2. Agent Gray

The appellant contends that the trial court also erred by allowing Agent Gray to testify regarding the effects of alprazolam. As with Agent Massengill, he claims that Agent Gray was a blood analyst and that "his expert opinion testimony should have been limited to his direct knowledge of identifying the specific drug and not to the effects of a specific drug on human performance." The State asserts that Agent Gray had sufficient training and knowledge to testify about the effects of the drug. We conclude that the appellant is not entitled to relief.

At trial, Agent Gray testified that he received his Bachelor's Degree in Chemistry from Tennessee Technology University. He acknowledged that he had studied the effects of drugs on humans. The State tendered Agent Gray as an expert in toxicology and, in a bench conference, advised the trial court that Agent Gray was going to testify about the effects of alprazolam. During a jury-out hearing, Agent Gray testified that he had performed numerous tests in which he had found the presence of alprazolam, also known as Xanax, noting that it was a popular drug, and that he had previously testified five or six times about the effects of alprazolam. On cross-examination, Agent Gray testified that he had testified previously about the "general" effects of the drug "because each individual is different and

some side effects are going to be more common or more prevalent in certain individuals than others." He said that he typically testified as to whether the amount found in the blood was within the "therapeutic range" and that "then normally I will say when you're taking Alprazolam there are certain effects you can see." He said that his testimony usually was for the purpose of corroborating a police officer's observations.

At the conclusion of his jury-out testimony, defense counsel objected to the agent's testifying about the effects of alprazolam. The trial court found that based upon his training and experience, Agent Gray could identify the drug he found, the type of drug, the effects of the drug, and the types of behavior that could indicate the appellant was under the influence. When the jurors returned to the courtroom, the trial court informed them that it had found Agent Gray to be an expert in toxicology and blood analysis. During his trial testimony, Agent Gray stated that there were "lots of listed effects" for Xanax, including depression, confusion, hyper-activity, hallucination, drowsiness, and dizziness.

Again, we conclude that the appellant is not entitled to relief. Agent Gray stated during the jury-out hearing that he had testified previously about the effects of alprazolam and that he could only testify about the general effects because the drug affected different people in different ways. In front of the jury, Agent Gray listed those general effects. Therefore, we cannot say that the trial court erred by allowing Agent Gray to testify about the effects of alprazolam.

## B. Test Results

The appellant contends that the trial court should have suppressed his blood test results because the amount of bath salts in his blood could not be quantified. He claims that because the test results could not quantify the amount of alpha-PVP, it was impossible to determine the effects of the drug. Therefore, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The State responds that the mere presence of bath salts in the appellant's blood was highly relevant to the charges of DUI and possession of a handgun while under the influence, and, therefore, that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. We agree with the State.

Generally, to be admissible, evidence must be relevant to some issue at trial. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

In order to prove its case, the State had to show for three of the offenses that the appellant was under the influence of an intoxicant. Therefore, Agent Massengill's testimony that an intoxicating substance, specifically synthetic cathinone, alpha-PVP, was in the appellant's blood was highly relevant. Although Agent Massengill was unable to quantify the amount of the substance, she stated that "[i]f a drug is detectible in your system then it's acting on your system in one way or the other." She acknowledged that without knowing the exact dose, she was unable to say how profound that effect was in the instant case. We conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the evidence.

### C. Chemical Name

The appellant claims that the trial court erred by allowing the State to refer to alpha-PVP as "bath salts" instead of its chemical name. He contends that "[t]he mere mention that someone may be under the influence of bath salts automatically conjures up negative assumptions. These negative assumptions are impossible to overcome in trial." He contends, therefore, that the probative value of the term was far outweighed by its prejudicial value. The State argues that the appellant is not entitled to relief. We agree with the State.

In a pretrial hearing, defense counsel objected to "[t]he use of the term bath salts." During her jury-out testimony, Agent Massengill explained that because most people were unfamiliar with the term "Alpha-PVP," she used "bath salts." She also stated that alpha-PVP usually was marketed as "bath salts" and that the term was a "point of information for the officer, the arresting agency and whoever is trying to interpret" a toxicology report. The court concluded that

> [regarding] the term bath salts[, ] . . . the expert can testify and use in her testimony, and she also probably needs to explain it, too, just so the jury will understand as to why she used that term. It is on her official TBI report. She explained that these

-14-

substances tend to be marketed as, and she put quotes around it, "bath salts," in the sense that it's not for human consumption but to put in your bath. So while it may have been used – I think that it is a term that's used by her and others at the TBI and that I don't believe that its probative value – and I think it gives the jury a point of reference but I don't think its probative value [is outweighed by] any prejudicial effect.

We conclude that the trial court did not abuse its discretion by allowing the State to use the term "bath salts." Agent Massengill testified that alpha-PVP was commonly referred to and marketed as "bath salts." The appellant has failed to show the probative value of the term was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403.

## D. Sufficiency of the Evidence

The appellant complains that the evidence is insufficient to support his convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Regarding the appellant's DUI conviction, Tennessee Code Annotated section 55-10-401 (2011) provides as follows:

(a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system.

See also Tenn. Code Ann. § 55-10-403(a)(1)(A)(iv) (providing the minimum sentencing for a person convicted of DUI, second offense).

Regarding the appellant's conviction for unlawful carrying or possession of a weapon, Tennessee Code Annotated section 39-17-1307 provides,

(a)(1) A person commits an offense who carries with the intent to go armed a firearm, a knife with a blade length exceeding four inches (4"), or a club.

. . . .

(C) A violation of subdivision (a)(1) is a Class A misdemeanor if the person's carrying of a handgun occurred at a place open to the public where one (1) or more persons were present.

As to the appellant's conviction for possessing a handgun while under the influence, Tennessee Code Annotated section 39-17-1321(a) provides that "[n]otwithstanding whether a person has a permit issued pursuant to § 39-17-1315 or § 39-17-1351, it is an offense for a person to possess a handgun while under the influence of alcohol or any controlled substance or controlled substance analogue."

Finally, as to the appellant's conviction for possession of drug paraphernalia, Tennessee Code Annotated section 39-17-425(a)(1) states:

Except when used or possessed with the intent to use by a person authorized by this part and title 53, chapter 11, parts 3

-16-

and 4 to dispense, prescribe, manufacture or possess a controlled substance, it is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part.

Taken in the light most favorable to the State, the evidence shows that on February 28, 2012, Biggs saw the appellant drive up Biggs's steep driveway and "bump" Biggs's car. The only way to access the driveway was from Cross Community Road, a public roadway. When the appellant got out of his car, he appeared disoriented and confused and had difficulty walking steadily. The appellant drove to the bottom of the driveway, and Detective Price arrived. Detective Price said that the appellant was acting "wild, bouncing off the walls," that the appellant did not acknowledge when the officer spoke to him, and that he thought the appellant was under the influence of "some type of drug or something." Detective Price told the appellant to come toward him, but the appellant went to the passenger side of the car and started searching under the seat. Detective Price pulled the appellant out of the car. Officer Davis and Officer Campbell arrived and handcuffed the appellant, and Detective Price found a loaded handgun underneath the front passenger seat. Officer Davis said the appellant was "walking somewhat all right" but was "talking a lot" about wanting a blood test and had slurred speech. Officer Davis thought the appellant might be impaired, and Officer Campbell asked the appellant to perform field sobriety tests. Officer Davis explained that "[j]ust off the field sobriety test[s, he] was kind of iffy on" whether the appellant was under the influence. However, when he considered the appellant's behavior in conjunction with his performance on the tests, Officer Davis concluded that the appellant was under the influence of an intoxicant. Officer Campbell agreed with that assessment. During a search of the appellant's person, the officers found two pipes, one for snorting substances such as bath salts and the other for smoking marijuana. During a search of the appellant's vehicle, the officers found a pipe for smoking illegal substances and a syringe with a melted plunger. A blood test revealed alprazolam in the appellant's system in an amount slightly greater than a therapeutic amount and synthetic cathinone, alpha-PVP. The appellant acknowledged that he had ingested bath salts. Based upon this evidence, we conclude that a jury could have found the appellant guilty of driving under the influence (DUI), second offense; unlawful carrying or possession of a weapon; possession of drug paraphernalia; and possession of a handgun while under the influence.

E. Sentencing

-17-

The appellant complains that the trial court erred by denying his request for alternative sentencing for his DUI, second offense, conviction and by finding him to be a dangerous offender. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, the trial court noted that Richard Mason, a probation officer, had sent a letter to the court advising that on January 14 and 15, 2013, the appellant took drug tests at the probation office. The tests were positive for benzodiazapine and buprenorphine. The State introduced a National Crime Information Center report, listing the appellant's prior convictions of DUI, underage consumption of alcohol, public intoxication, two counts of possession of drug paraphernalia, possession of marijuana, and possession of an unnamed substance.

The appellant testified that during his trial, he wore what he believed was a nicotine patch that had been given to him by his cousin. After the appellant tested positive for buprenorphine, he learned the patch was "a Butyrin's patch." The appellant could not explain why he tested positive for benzodiazapine, claiming that he had not taken Xanax for three weeks to a month. The appellant acknowledged that he was unemployed and said that he had filled out several resumes but had received no response. The appellant said he had worked at Arby's for two or three years, Vicars Construction for seven years, Mid-Mountain Foods for two years, and Virginian Golf Course for three years. The appellant was fired from the golf course because of his abuse of bath salts. The appellant said he had obtained his general equivalency diploma (GED) and that his only local family member was his father. Eight years before the sentencing hearing, the appellant had successfully completed a two-year probation sentence for his public intoxication conviction.

The trial court applied and gave great weight to enhancement factor (1), that the appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1). The court noted that for two of the appellant's prior convictions, DUI and public intoxication, he was "under the influence to the point that he was a danger to himself or others." Additionally, the appellant had two prior convictions for possession of drug paraphernalia, "just like he did in this case." The court questioned the credibility of the appellant's trial testimony, noting large discrepancies between his testimony and that of the State's witnesses. The court opined that the appellant had either lied under oath or been too intoxicated to correctly remember the events. The court noted that the appellant had "some work history." See Tenn. Code Ann. § 40-35-113(13). The court sentenced him to eleven months and twenty-nine days for the convictions, all Class A misdemeanors, with seventy-five percent release eligibility. The trial court ordered that the appellant serve the DUI sentence in confinement and the remaining sentences on probation.

Regarding consecutive sentencing, the trial court found that the appellant had an extensive criminal history and noted that he had repeatedly committed the same offenses, demonstrating a poor rehabilitative potential. The court also found that the appellant was a dangerous offender due to his driving under the influence while in the possession of a loaded weapon and hitting another vehicle. The court found that consecutive sentencing was necessary to protect the public and reasonably related to the severity of the offenses. The court ordered that the sentences for possession of drug paraphernalia and DUI, second offense, be served concurrently with each other but consecutively to the remainder of the sentences.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Additionally, our supreme court's recent decision in State v. James Allen Pollard, __ S.W.3d __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7 (Tenn. at Nashville, Dec. 20, 2013), specifically applied the abuse of discretion standard, accompanied by a presumption of reasonableness, to appellate review of consecutive sentencing and further stated that the standard applies to all sentencing decisions.

In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each

felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343.

In misdemeanor sentencing, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). Thus, the trial court is afforded considerable latitude in misdemeanor sentencing. See State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court retains the authority to place a defendant on probation immediately or after a time of confinement. See Tenn. Code Ann. § 40-35-302(a). In sentencing a misdemeanor defendant, the trial court must fix a percentage of the sentence, not to exceed seventy-five percent, that the defendant must serve in confinement before being eligible for release into rehabilitative programs. See Tenn. Code Ann. § 40-35-302(d).

The appellant contends that the trial court abused its discretion by denying full probation and ordering him to serve seventy-five percent of his sentence of eleven months and twenty-nine days for his conviction of DUI, second offense.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996).  Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate.  See Tenn. Code Ann. § 40-35-103(5).  "[T]hose convicted of misdemeanors are . . . not presumed eligible for alternative sentencing."  State v. Lora Ashley, No. M2008-01563-CCA-R3-CD, 2009 WL 890890, at *3 (Tenn. Crim. App. at Nashville, Mar. 26, 2009).

Moreover, an appellant seeking full probation bears the burden of establishing his suitability for full probation, regardless of whether he is considered a favorable candidate for alternative sentencing.  See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-303(b).  To prove his suitability, the appellant must establish that granting full probation will "subserve the ends of justice and the best interest of both the public and the [appellant]."  State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (internal quotation marks and citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000).  Notably,

[i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477.

In the instant case, the appellant has continued to violate the law, demonstrating a lack of rehabilitative potential. Further, the trial court found that the appellant was not credible and that measures less restrictive than confinement had recently and repeatedly failed to reform the appellant's conduct, further indicating that his rehabilitative potential was poor. As this court has said, an offender's "rehabilitation potential and the risk of repeating criminal conduct are fundamental in determining whether he or she is suited for alternative sentencing." State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). We conclude that nothing in the record preponderates against the trial court's finding that the appellant was not an appropriate candidate for full probation.

The appellant also contends that the trial court's finding him to be a dangerous offender was "unfounded." Tennessee Code Annotated section 40-35-115(b)(2) provides for consecutive sentencing for "an offender whose record of criminal activity is extensive." In this case, the trial court's comments demonstrate that the court was greatly troubled by the appellant's driving while under the influence and doing so while in the possession of a loaded gun. The trial court also was troubled by the fact that the appellant had continued to commit the same crimes. As our supreme court has stated, "[t]rial courts can consider prior misdemeanors in determining whether a defendant has an extensive record of criminal activity" because "they indicate a consistent pattern of operating outside the confines of lawful behavior." State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013). Therefore, we conclude that the trial court also did not abuse its discretion by finding the appellant to be a dangerous offender and by ordering that he serve some of his misdemeanor sentences consecutively.

## III.  Conclusion

In sum, we conclude that the trial court did not err in the admission of evidence, that the evidence is sufficient to support the appellant's convictions, and that the trial court did not err in sentencing the appellant. Accordingly, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE

-22-